**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Marvin Percival JOHNSON, Kathleen M.**
**Johnson, Defendants-Appellants.**

**No. 82–8305.**

United States Court of Appeals,
Eleventh Circuit.

Aug. 29, 1983.

Stanley M. Baum, Atlanta, Ga. (Court-appointed), for Marvin Johnson.

Mary S. Donovan, Federal Defender Program, Inc., Atlanta, Ga., for Kathleen M. Johnson.

Anthony L. Cochran, Asst. U.S. Atty., Atlanta, Ga., for plaintiff-appellee.

Before HILL, KRAVITCH and HENDERSON, Circuit Judges.

ALBERT J. HENDERSON, Circuit Judge:

Marvin and Kathleen Johnson appeal their convictions in the United States District Court for the Northern District of Georgia for endeavoring to obstruct the due administration of justice. 18 U.S.C. § 1503.[1] In this court, they assert several

---

1. 18 U.S.C. § 1503 was amended effective October 12, 1982 and replaced, in relevant part, by

grounds of error including improper venue, insufficiency of the evidence, the unconstitutionality of a search and the denial of a new trial based on newly discovered evidence. Finding no error, we affirm.

On June 6, 1981, Kathy Hargan was arrested in Atlanta, Georgia when she was discovered attempting to stowaway in a trunk in the luggage compartment of a Delta Airlines airplane. Shortly after her arrest she informed the authorities of her involvement in a scheme to steal certain property aboard the aircraft. During this interview she implicated the appellant, Marvin Johnson, as a co-conspirator in the unlawful enterprise. As a result, Johnson was indicted in the Northern District of Georgia for conspiracy to violate 18 U.S.C. §§ 2199 and 659. Hargan negotiated a plea agreement with the government, consenting to testify against Johnson in the upcoming trial. Thereafter she apparently entered the government's witness protection program and was relocated to an undisclosed destination.

Sarah Kissell, Kathy Hargan's very close friend, worked at the "Wanna Sauna", a "health spa" in Royal Oak, Michigan, an area just outside Detroit. On September 10, 1981, while she was at work, the manager of the spa, Dana Lucas, asked Kissell to follow him in her automobile to an Arco service station so that he could leave his car for repairs. Kissell complied with this request. While she was waiting for Lucas in her automobile, she noticed that the passengers of another car at the station were sounding their horn to attract her attention. Believing that the automobile belonged to a friend, she told Lucas to take her car back to their place of employment. When she stepped up to the other automobile, Kathleen Johnson got out and forced her to get in the vehicle, threatening to kill her if she refused. Mrs. Johnson also directed Kissell's attention to an automobile located some distance away which contained several men and appeared to have a shotgun or a pipe protruding from the rear window. When Kissell got into the car, she recognized Marvin Johnson, Kathleen Johnson's husband, who was sitting in the driver's seat. Kissell knew both Johnsons; she and Marvin Johnson had been lovers at one time. When Kissell entered the Johnsons' vehicle, she was not wearing shoes and did not have any personal belongings with her.

The Johnsons drove around for a while and questioned Kissell concerning the whereabouts of Kathy Hargan. During this time, in response to Marvin Johnson's instructions, Kissell telephoned the Wanna Sauna and told her boss that she would be in the hospital for three months. She asked him to clear out her apartment and place her things in storage and to retain her purse, keys and car at the Wanna Sauna.

The Johnsons then removed Kissell to the Easy Rest Motel, where the group stayed until the morning of September 13, 1981. In the interim, Kissell was questioned fur-

18 U.S.C. § 1512 ("Tampering with a witness, victim, or an informant"). See 18 U.S.C.A. § 1512 (West Supp.1983). The version of 18 U.S.C. § 1503 applicable to this case provides:
 Whoever corruptly, or by threats or force, or by any threatening letter or communication, endeavors to influence, intimidate, or impede any witness, in any court of the United States or before any United States commissioner or other committing magistrate, or any grand or petit juror, or officer in or of any court of the United States, or officer who may be serving at any examination or other proceedings before any United States commissioner or other committing magistrate, in the discharge of his duty, or injures any party or witness in his person or property on account of his attending or having attended such court or examination before such offi- cer, commissioner, or other committing magistrate, or on account of his testifying or having testified to any matter pending therein, or injures any such grand or petit juror in his person or property on account of any verdict or indictment assented to by him, or on account of his being or having been such a juror, or injures any such officer, commissioner, or other committing magistrate in his person or property on account of the performance of his official duties, or corruptly or by threats or force, or by any threatening letter or communication, influences, obstructs, or impedes, or endeavors to influence, obstruct, or impede, the due administration of justice, shall be fined not more than $5,000 or imprisoned not more than five years, or both.

ther about Kathy Hargan's current address. Marvin Johnson indicated that he intended to have Hargan killed. While in the Johnsons' custody, Kissell was never tied up or bound in any manner nor did she see any weapons. She testified, however, that Johnson threatened to kill her if she tried to escape and that she knew Marvin Johnson customarily carried a gun.

During the period in which the Johnsons had custody of Kissell, the group ventured out of the motel room on several occasions. On Friday, September 11, 1981, Kathleen Johnson went out to get them breakfast and purchased underclothing, birth control pills, a toothbrush, a sweatshirt and shoes for Kissell. Kissell remained with Marvin Johnson in the motel room while Kathleen Johnson ran these errands. That evening Kissell and the Johnsons went to a Bonanza steak house for dinner. On Saturday, September 12, Kissell accompanied Kathleen Johnson to several locations including a laundromat, a K–Mart, a liquor store and a fast food restaurant. On Saturday, Kissell and Mrs. Johnson also went to the home of an acquaintance of Kissell for the purpose of purchasing drugs.

The group moved to another motel, the Red Roof Inn, on Sunday morning. When they drove up to the motel, Marvin Johnson instructed Kissell to hide on the floor in the back seat. After they moved into the new motel room, Kissell and Kathleen Johnson left to purchase cigars and food. On this trip, Kissell remained alone in the car while Kathleen Johnson entered a store to buy the cigars. Kissell and Mrs. Johnson then went to a Kroger grocery store. While Mrs. Johnson was in the supermarket, Kissell got out of the car and ran into a Kinney shoe store, located approximately three doors down from the grocery. She hurried to the back of the establishment, told a clerk that she had been kidnapped and asked her to call the FBI. In a very excited tone she also requested that the clerk hide her, exclaiming that "they" would hurt her and "they" had guns. Shortly thereafter, Sergeant Switzer from the local Farmington police department arrived and removed Kissell to the police station.

When Kathleen Johnson came out of the grocery store and noticed that Kissell was missing, she looked for her and telephoned her husband. Mrs. Johnson was arrested as she attempted to drive away. Marvin Johnson was later arrested in a parking lot at a local Holiday Inn.

At the trial, Kissell testified that she did not try to escape at an earlier time because she feared that she would be killed. According to her testimony, Marvin Johnson said that he would release her if she told him where Kathy Hargan was located. Kissell never revealed Hargan's whereabouts.

The Johnsons were indicted in the Northern District of Georgia for endeavoring to obstruct the upcoming criminal trial of Marvin Johnson, which was pending in the Northern District of Georgia. They were each convicted after a jury trial.

The appellants first attack venue in the Northern District of Georgia. They urge that because the alleged kidnapping occurred in Detroit, Michigan, they should have been tried in that district. They claim that they were prejudiced by their inability to investigate, to call witnesses and to have a jury composed of people with knowledge of the location of the crime.

■ This argument, however, is foreclosed by *United States v. Barham,* 666 F.2d 521 (11th Cir.) *cert. denied,* 456 U.S. 947, 102 S.Ct. 2015, 72 L.Ed.2d 470 (1982). In *Barham,* the defendant was charged with a violation of 18 U.S.C. § 1503 arising from his attempt to kill a witness who was scheduled to testify against him in the Northern District of Alabama. The shooting occurred in Tennessee. This court rejected the defendant's contention that his trial on the section 1503 charge should have been held in Tennessee. The court determined that venue was properly laid in the Northern District of Alabama because the judicial proceeding which could have been impeded by the defendant's conduct was pending in that district. In so holding, the court adhered to the decisions of the United States Court of Appeals for the First and Sixth

Circuits and declined to follow the contrary conclusion of the District of Columbia Circuit. *See United States v. O'Donnell,* 510 F.2d 1190 (6th Cir.), *cert. denied,* 421 U.S. 1001, 95 S.Ct. 2400, 44 L.Ed.2d 668 (1975); *United States v. Tedesco,* 635 F.2d 902 (1st Cir.1980), *cert. denied,* 452 U.S. 962, 101 S.Ct. 3112, 69 L.Ed.2d 974 (1981); *United States v. Swann,* 441 F.2d 1053 (D.C.Cir. 1971). Thus, in a section 1503 prosecution " 'venue ... is to be determined by focusing on which court is affected by the attempt to influence, obstruct, or impede the due administration of justice. *It is the impact of the acts, not their location, that controls.'* " *Barham,* 666 F.2d at 524 (quoting *Tedesco,* 635 F.2d at 906) (emphasis supplied) (footnote omitted). The appellants were charged with endeavoring to obstruct the upcoming criminal trial in the Northern District of Georgia. Under *Barham,* which is binding precedent, venue for their section 1503 trial was proper in that district.

Turning to the trial itself, the appellants complain of the conduct of the government in calling an expert to testify without prior notification. During the trial, Sergeant Switzer, the Farmington, Michigan police officer who saw Kissell at the Kinney shoe store shortly after she escaped, was qualified as an Emergency Medical Technician expert. Over defense objection, he testified that in his expert opinion Kissell was in a state of shock when he first saw her. The appellants contend that the government should have informed them before the trial that Sergeant Switzer would testify as an expert. They claim that this testimony was highly prejudicial because it tended to contradict their defense that Kissell was not being held against her will.

 A criminal defendant has no absolute right to a list of the government's witnesses in advance of the trial. *See United States v. Colson,* 662 F.2d 1389, 1391 (11th Cir.1981); *United States v. Hancock,* 441 F.2d 1285 (5th Cir.), *cert. denied,* 404

U.S. 833, 92 S.Ct. 81, 30 L.Ed.2d 63 (1971).[2] Although in civil cases litigants may be required to designate expert witnesses during discovery, *see* Fed.R.Civ.P. 26(b), the scope of discovery in criminal cases is significantly more restricted. *See Hancock,* 441 F.2d at 1287. In criminal cases, the government must supply, upon the defendant's request, the results or reports of physical or mental examinations. *See* Fed.R. Crim.P. 16(a)(1)(D). However, no such reports were made in this case. A district judge has broad discretion in admitting or excluding expert testimony. *United States v. Costa,* 691 F.2d 1358, 1361–1362 (11th Cir.1982). Under the circumstances, the district court did not abuse its discretion in admitting Sergeant Switzer's testimony.

 Next, Marvin Johnson claims that the district court abused its discretion in failing to grant a mistrial when a government agent testified that Kissell was granted immunity from prosecution for transportation of narcotics in exchange for information about Marvin Johnson. Johnson reasons that this testimony prejudicially implied that he was connected with the illegal drug trade. Again, we find no error. Although the jury might have presumed that Johnson and Kissell were involved in illegal drugs, that conclusion is by no means compelled by the testimony. The Johnsons elicited testimony from Kissell concerning her immunity in an effort to impeach her credibility. The government's evidence provided an explanation of the source of the immunity grant so as to foreclose speculation of the nature of her criminal activity. As with the admission or exclusion of evidence, the decision whether to grant a mistrial is left to the sound discretion of the district court. *United States v. Hughes,* 658 F.2d 317, 323 (5th Cir.1981), *cert. denied,* 455 U.S. 922, 102 S.Ct. 1280, 71 L.Ed.2d 463 (1982); *United States v. Abrams,* 568 F.2d 411, 425–426 (5th Cir.), *cert. denied,* 437 U.S. 903, 98 S.Ct. 3089, 57 L.Ed.2d 1133 (1978). We perceive of no abuse of that discretion.

**2.** In *Bonner v. City of Prichard,* 661 F.2d 1206 (11th Cir.1981) (*en banc*), the Eleventh Circuit Court of Appeals adopted as precedent the de-cisions of the former Fifth Circuit issued before October 1, 1981.

Both appellants challenge the admission of evidence uncovered in a search of their motel room at the Red Roof Inn. This search, which was conducted pursuant to a warrant, uncovered many items including a gun, a knife, surgical gloves, a twenty-five foot roll of picture wire and some rope. The appellants maintain that these items should have been excluded because the warrant was issued without probable cause, the search exceeded the scope of the warrant and there was no evidentiary basis for admitting the evidence.

■ The search warrant was issued on the affidavit of Detective Hauner of the Farmington Hills police department. He recited the details of Kissell's kidnapping, explaining that he received the information from FBI agent Hullinger who had interviewed Kissell. Thus, the facts upon which the probable cause determination was predicated originated from Kissell, the victim of the crime. There is no need to establish the reliability of information received from the victim of a crime. *See United States v. Flynn,* 664 F.2d 1296, 1302 (5th Cir.), *cert. denied,* 456 U.S. 930, 102 S.Ct. 1979, 72 L.Ed.2d 446 (1982); *United States v. Bell,* 457 F.2d 1231, 1238–39 (5th Cir.), *appeal after remand,* 470 F.2d 1178 (5th Cir.1972). Moreover, under the recently announced "totality of the circumstances" test, *see Illinois v. Gates,* —— U.S. ——, ——, 103 S.Ct. 2317 at 2328, 76 L.Ed.2d 527 (1983), the issuing officer reasonably could have determined that, "given all the circumstances set forth in the affidavit . . . , including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there [was] . . . a fair probability that . . . evidence of a crime . . ." would be found in the motel room. *Id.* at ——, 103 S.Ct. at 2332. The affidavit provided a reason for the belief that a gun and Kissell's clothing were in the motel room and that Kissell had been held against her will in that room. This information provided a " 'substantial basis for . . . conclud[ing]' that probable cause existed." *Id.* (quoting *Jones v. United States,* 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960)).

■ Because the police officers seized items that were not listed on the warrant, e.g. the knife, rope, wire and surgical gloves, the appellants claim that those items should have been excluded from evidence. Ordinarily, "only items described in a search warrant may be seized." *United States v. Bills,* 555 F.2d 1250, 1251 (5th Cir.1977). However, when in the course of performing a lawful search for an item listed on the warrant, the officers come across other articles of an incriminatory character, that property may be seized under the plain view doctrine. *Id. See also, United States v. Roberts,* 619 F.2d 379 (5th Cir.1980). In this instance, the officers were permitted to search the motel room for a gun, a road atlas and Kissell's belongings. During the course of that search they discovered other items which could have been used during the kidnapping. Accordingly, that property could be lawfully seized.

■ In their final assault on the search and the fruits thereof, the Johnsons argue there was no evidence that Kissell ever saw any weapons or was bound in any manner. Our review in this instance is limited to a determination of whether the district court abused its discretion in admitting the evidence. *See United States v. Veal,* 703 F.2d 1224, 1230 (11th Cir.1983); *United States v. Terebecki,* 692 F.2d 1345, 1350 (11th Cir.1982). The district court reasonably could have determined that the evidence supported the inference that the Johnsons would have restrained or injured Kissell if she tried to escape. Given this relevance, no abuse of discretion is apparent.

The appellants contend that the guilty verdicts were based entirely on Kissell's testimony and that her story lacked credibility. Therefore, they say, the evidence was insufficient to sustain their convictions. They point to purported inconsistencies between Kissell's testimony before and during the trial to support their assertion that she was utterly incredible. Also, it is claimed that the evidence that Kissell accompanied the Johnsons to several public places, yet

did not attempt to escape, establishes the falsity of her statement that she was kidnapped.

On appeal, the evidence must be viewed in the light most favorable to the government. *Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed.2d 680 (1942); *United States v. Molinaires,* 700 F.2d 647 (11th Cir.1983). It is not for us to decide which witnesses we find more believable— "[c]redibility choices lie within the province of the jury." *United States v. Castaneda-Reyes,* 703 F.2d 522, 524 (11th Cir.1983). "Whether there were inconsistencies and, if so, how this affected [the witness's] . . . credibility, were questions for the jury." *United States v. De Los Santos,* 625 F.2d 62, 65 (5th Cir.1980). *See also, United States v. Branca,* 677 F.2d 59, 61 (11th Cir.1982) ("[c]redibility choices in deciding which version of a story to believe are . . . a matter for the jury, not for this Court"); *United States v. Tolliver,* 665 F.2d 1005, 1007 (11th Cir.), *cert. denied,* 456 U.S. 935, 102 S.Ct. 1991, 72 L.Ed.2d 455 (1982) ("[t]his court may not assess the relative credibility of witnesses; that function is reserved for the trier of fact."); *United States v. Miller,* 664 F.2d 826, 828 (11th Cir.1981) ("[c]redibility determinations are the province of the jury, not this court."). Consequently, our review is limited to a determination of whether a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt. *United States v. Vera,* 701 F.2d 1349 (11th Cir.1983).

In order to establish a violation of section 1503, the government was required to prove that each defendant specifically intended to impede the administration of justice. *United States v. Johnson,* 585 F.2d 119, 128 (5th Cir.1978); *Knight v. United States,* 310 F.2d 305, 307 (5th Cir. 1962). However, the government was not required to prove beyond a reasonable doubt the appellants' guilt of kidnapping under Michigan law. Kissell testified that the Johnsons forcibly detained her and threatened her in an effort to learn Kathy Hargan's whereabouts. According to Kissell, Marvin Johnson indicated that he in-

tended to kill Hargan, who was scheduled to be a witness against him in his forthcoming criminal trial. Marvin Johnson told her that he would let her go only after she disclosed Hargan's location. Kathleen Johnson was a party to this detention. She forced Kissell into the car and actively participated in the three-day extortion attempt. Viewed in the light most favorable to the government and accepting the jury's decision to believe Kissell's testimony, the evidence was sufficient for a reasonable jury to conclude that the Johnsons specifically intended to obstruct justice.

After the trial, the appellants moved for a new trial because of certain "newly discovered evidence". This evidence consisted of the affidavit of Al Rosenberg, who resides in the Detroit area. In his affidavit, Rosenberg stated that he had telephone conversations with Kissell during the weekend under investigation in which she said that she had gone away for the weekend with a girlfriend and invited him to come "party with them". She also told him that she had gone to a Mr. Lippin's house during that time. The district court denied the motion for a new trial based on newly discovered evidence. *See* Fed.R.Crim.P. Rule 33.

The decision whether to grant or deny a Rule 33 motion is left to the sound discretion of the district court. Reversal of that ruling is not justified unless it was so clearly erroneous as to constitute an abuse of discretion. *United States v. Metz,* 652 F.2d 478 (5th Cir.1981); *United States v. Antone,* 603 F.2d 566 (5th Cir. 1979). A new trial based upon newly discovered evidence "should be granted only with great caution." *Metz,* 652 F.2d at 479 (footnote omitted).

Proof of four elements is necessary to prevail on such a motion.

(1) The evidence must be newly discovered and have been unknown to the defendant at the time of trial;

(2) The evidence must be material, and not merely cumulative or impeaching;

(3) The evidence must be such that it will probably produce an acquittal; and

(4) The failure to learn of such evidence must be due to no lack of diligence on the part of the defendant.

*Bentley v. United States,* 701 F.2d 897, 898 (11th Cir.1983). *See also, Metz,* 652 F.2d at 479; *Antone,* 603 F.2d at 568–569.

 During the trial, Richard Lippin testified that he saw Kissell during her weekend with the Johnsons and that when he told her that he had heard she had been kidnapped she replied " 'I wasn't kidnapped. I went away with a girlfriend for a few days and right away everybody gets uptight about it.' " Tr. Vol. 4, 2–140. Thus, the jury heard evidence indicating that Kissell told people during that weekend that she was staying with a friend. Furthermore, the Johnsons presented a great deal of evidence designed to discredit Kissell's claim that they kidnapped her. They also repeatedly attempted to impeach Kissell with prior inconsistent statements. While Rosenberg's affidavit might support their defense, it is also cumulative and impeaching. We cannot agree that it would probably produce an acquittal on retrial.

Finally, just prior to the scheduled date for oral argument in this court, Marvin Johnson filed a supplemental brief challenging the procedure employed by the government in obtaining his custody from the Michigan authorities. He claims, for the first time, that the government violated the Interstate Agreement on Detainers, 18 U.S. C.App., as interpreted in *Cuyler v. Adams,* 449 U.S. 433, 101 S.Ct. 703, 66 L.Ed.2d 641 (1981), and *United States v. Mauro,* 436 U.S. 340, 98 S.Ct. 1834, 56 L.Ed.2d 329 (1978). However, he did not raise this argument or assert this alleged impropriety in the district court. Accordingly, failure to call this discrepancy, if any, to the attention of the district court in the first instance precludes our review on appeal. *See Mars v. United States,* 615 F.2d 704, 707 (6th Cir.), *cert. denied,* 449 U.S. 849, 101 S.Ct. 138, 66 L.Ed.2d 60 (1980); *United States v. Eaddy,* 595 F.2d 341, 346 (6th Cir.1979); *cf. United States v. Boggs,* 612 F.2d 991, 993 (5th Cir.),

*cert. denied,* 449 U.S. 857, 101 S.Ct. 156, 66 L.Ed.2d 72 (1980) (claim of violation of Interstate Agreement on Detainers waived if not raised until § 2255 motion to vacate sentence).

AFFIRMED.